ACCEPTED
03-15-00416-CV
7272571
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/7/2015 2:22:25 PM
JEFFREY D. KYLE
CLERK

**NO. 03-15-00416-CV**

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/7/2015 2:22:25 PM
JEFFREY D. KYLE
Clerk

**OAK MORTGAGE GROUP, INC.; MICHAEL H. NASSERFAR;
MICHAEL E. TASK; and TYCORD R. GOSNAY,**

**Appellants,**

**v.**

**AMERIPRO FUNDING, INC.,**

**Appellee.**

On Appeal from the 345th District Court of Travis County, Texas
Hon. Gisela D. Triana, Presiding

**BRIEF OF APPELLEE
AMERIPRO FUNDING, INC.**

Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Ave., Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5600
Facsimile: (512) 480-5838

ATTORNEYS FOR APPELLEE AMERIPRO FUNDING, INC.

October 7, 2015

**IDENTITY OF PARTIES AND COUNSEL**

| **Appellants/Plaintiffs/ Counter-Defendants** | **Attorneys for Appellants/Plaintiffs/ Counter-Defendants** |
|---|---|
| Oak Mortgage Group, Inc. Michael H. Nasserfar Michael E. Task Tycord R. Gosnay | Wm. Charles Bundren WM. CHARLES BUNDREN & ASSOCIATES Law Group, PLLC 2591 Dallas Parkway, Suite 300 Frisco, Texas  75034 (214) 808-3555 (Telephone) (972) 624-5340 (Facsimile) Charles@bundrenlaw.net |

| **Appellee/Defendant/ Counter-Plaintiff** | **Attorneys for Appellee/Defendant Counter-Plaintiff** |
|---|---|
| Ameripro Funding, Inc. | Susan P. Burton Eric G. Behrens GRAVES, DOUGHERTY, HEARON & MOODY, P.C. 401 Congress Avenue, Suite 2200 Austin, Texas  78701 (512) 480-5600 (Telephone) (512) 536-9908 (Facsimile) sburton@gdhm.com ebehrens@gdhm.com |

## ABBREVIATIONS AND RECORD CITATIONS

The following abbreviations and notations are used in this Brief:

CR; 1CR; 2CR — References to the Clerk's Record (record, supplement I, and supplement II).

1RR; 2RR; 3RR — References to the Reporter's Record (three volumes – Index, Transcript).

AX; PX; CX — References to the exhibits (in Vol. 4 of the Reporter's Record: Applicant Ameripro's exhibits, Plaintiffs' exhibits, Court exhibit).

App. Br. — References to Brief of Appellants.

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ..................................................................ii

ABBREVIATIONS AND RECORD CITATIONS .......................................................iii

TABLE OF CONTENTS ...................................................................................... iv

TABLE OF AUTHORITIES .................................................................................. ix

STATEMENT OF THE CASE .............................................................................. xiv

STATEMENT REGARDING ORAL ARGUMENT ..................................................... xv

ISSUES PRESENTED ........................................................................................ xvi

STATEMENT OF FACTS ...................................................................................... 1

    I.     Introduction: overview of the conduct which led to the injunction........ 1

    II.    Ameripro's creation of the Lakeway branch office, and
          the Individual Appellants' fiduciary roles for Ameripro ........................ 4

    III.   The non-solicitation clauses and ownership
          provisions in the Ameripro contracts ..................................................... 4

         A.   Ameripro's confidential information includes each
              category outlined in the Temporary Injunction............................. 5

         B.   Brohn, Clark Wilson, and Seaholm were Ameripro
              customers under the contractual non-solicitation clauses.............. 5

         C.   Oak Mortgage's actual knowledge of the contract provisions ...... 7

    IV.   The Individual Appellants admitted that they took Ameripro's
          confidential information and provided it to Ameripro's
          competitor.  They began doing so months before they resigned ............ 7

A. Appellants also downloaded and copied Ameripro's financial and customer data from its office and computers ..........8

B. The confidential information that Appellants took from Ameripro enabled them to jumpstart a competing office ............12

V. Appellants began soliciting Ameripro's customers for Oak Mortgage, even before the Individual Appellants had resigned from Ameripro...................................................13

A. One month before the Individual Appellants resigned as fiduciaries, Oak Mortgage agreed to indemnify them against Ameripro, and told them they could solicit its customers ...........13

B. While they were Ameripro's fiduciaries, the Individual Appellants began soliciting Ameripro customers for a competitor. Oak Mortgage sent "scripts" for them to use ..........14

VI. In addition to transmitting confidential data to Oak Mortgage before they resigned, the Individual Appellants removed over 20,000 Ameripro files and kept them as agents of Oak Mortgage .......16

VII. The Individual Appellants destroyed Ameripro documents, including its customer files, and destroyed files after the district court issued a TRO compelling their return.............................17

VIII. Appellants' successful disruption of Ameripro's business...................19

SUMMARY OF THE ARGUMENT ....................................................................20

ARGUMENT ...............................................................................................22

I. The Temporary Injunction satisfies the requirements of Rule 683 ......22

A. The reasons stated in the Temporary Injunction, which Appellants do not address or even mention in their brief............22

v

B.    The reasons stated in the Temporary Injunction go further than is required by Rule 683, as shown by multiple decisions ....23

C.    The decisions cited by Appellants do not assist them. One such decision lists the language from this Temporary Injunction as examples that *"comply* with rule 683" ...................28

II.    Appellants' own admissions establish that Ameripro's builder clients are "customers" under the non-solicitation clauses...................30

A.    Appellants make no attempt to address the testimony (including their own sworn admissions) that customers include borrowers *and* "builder customers"................................30

B.    The evidence regarding builder customers is consistent with the non-solicitation clause. .................................32

C.    Appellants' argument that the definition of "customers" should be construed against Ameripro conflicts with the contracts, which disclaim that either party is sole drafter............34

III.    Injunctive relief was also independently warranted because Appellants were barred from soliciting Ameripro customers for a *competitor* in breach of fiduciary duties, separate and apart from their breaches of contract and misappropriation .................35

A.    Appellants did not merely take the names of builder customers. They took pricing, lender credit data, compilations of builder preferences, and multiple other data from computers .................36

B.    Appellants' solicitation of Ameripro customers and use of confidential information for that purpose, even while the Individual Appellants were still Ameripro's fiduciaries..............37

C.    Even if Appellants supposedly *could* have publicly obtained some of the data they took from Ameripro computers, they tortiously downloaded Ameripro's work product........................40

IV.  Appellants' argument that they had returned all confidential
     information of Ameripro prior to the hearing is also false ...................42

     A.  Appellants did not return all confidential information,
         they violated the TRO, and they specifically stripped out
         system metadata from the documents they did provide ..............43

     B.  Appellants destroyed documents even after
         a TRO commanded their return ....................................................44

     C.  The fact that a competitor misappropriated confidential
         information at all also supports issuing the injunction ...............45

     D.  Appellants *used* Ameripro's confidential information,
         but *taking* such data was also wrongful misappropriation ..........46

V.   The district court correctly found that Ameripro does not
     have an adequate legal remedy.................................................................47

     A.  The district court found Ameripro has a likelihood of
         success on multiple tort theories for which injunction
         is the only effective relief, not just breach of contract................49

     B.  Even in pure contract cases, findings of inadequate remedy
         will be upheld where, as here, some evidence supports it ...........50

     C.  Injunctive relief is consistent with Ameripro's
         claim for damages for Appellants' *past* conduct ........................51

     D.  Appellants' argument, in addition to being baseless, is
         outside the hearing record and should be disregarded.................53

VI.  The Temporary Injunction is not overly broad, and instead is
     narrowly tailored to protect against imminent irreparable harm ..........54

PRAYER....................................................................................................................59

CERTIFICATE OF COMPLIANCE ...............................................................................60

CERTIFICATE OF SERVICE.................................................................................60

APPENDIX

Temporary Injunction Order...................................................................Tab 1

Highlighted testimony cited in this brief
from Volume 2 of the Reporter's Record (2RR) .......................................Tab 2

Highlighted testimony cited in this brief
from Volume 3 of the Reporter's Record (3RR) .......................................Tab 3

(Exhibits cited in this brief are bookmarked.)

# TABLE OF AUTHORITIES

**CASES**                                                             **PAGE(S)**

*Amalgamated Acme Affiliates, Inc. v. Minton*,
    33 S.W.3d 387 (Tex. App. – Austin 2000, no pet.) .....................................27

*American Precision Vibrator Co. v. National Air Vibrator Co.*,
    764 S.W.2d 274 (Tex. App. – Houston),
    *appeal stayed*, 771 S.W.2d 562 (Tex. App. – Houston 1989) ...............41, 42

*Branch Banking & Trust Co. v. TCI Luna Ventures, LLC*,
    2013 WL 1456651 (Tex. App. – Dallas Apr. 9, 2013, no pet.) ...................53

*Butnaru v. Ford Motor Co.*,
    84 S.W.3d 198 (Tex. 2002) .........................................................................52

*Byrd Ranch, Inc. v. Interwest Savings Association*,
    717 S.W.2d 452 (Tex. App. – Fort Worth 1986, no writ) ..........................28

*Cardinal Health Staffing Network, Inc. v. Bowen*,
    106 S.W.3d 230 (Tex. App. – Houston [1st Dist.] 2003, no pet.) ..........52, 53

*Conley v. DSC Commun. Corp.*,
    1999 WL 89955 (Tex. App. – Dallas Feb. 24, 1999, no pet.) .....................26

*Cornelison v. Offshore Entertain. Corp.*,
    2002 WL 34231619 (Tex. App. –
    Corpus Christi Dec. 5, 2002, no pet.) .........................................................29

*Correa v. Houston Surg. Asst. Serv., Inc.*,
    2013 WL 3958499 (Tex. App. –
    Houston [14th Dist.] July 30, 2013, no pet.) ...............................................55

*ERI Consult. Engrs., Inc. v. Swinnea*,
    318 S.W.3d 867 (Tex. 2010) .......................................................................35

*Fasken v. Darby*,
    901 S.W.2d 591 (Tex. App. – El Paso 1995, no pet.) .................................29

*Flake v. EGL Eagle Global Logistics, L.P.*,
2002 WL 31008136 (Tex. App. –
Houston [14th Dist.] Sept. 5, 2002, no pet.) ..................................................49

*Fox v. Tropical Warehouses, Inc.*,
121 S.W.3d 853 (Tex. App. – Fort Worth 2003, no pet.) ............................25

*Frequent Flyer Depot, Inc. v. American Airlines, Inc.*,
281 S.W.3d 215 (Tex. App. – Fort Worth 2009,
pet. denied), *cert. denied*, 559 U.S. 1036 (2010) ...................................50, 56

*Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*,
303 S.W.3d 700 (Tex. 2010) .......................................................................34

*Garth v. Staktek Corp.*,
876 S.W.2d 545 (Tex. App. – Austin 1994, writ dism'd w.o.j.) ...........49, 58

*General Homes, Inc. v. Wingate Civic Ass'n*,
616 S.W.2d 351 (Tex. Civ. App. –
Houston [14th Dist.] 1981, no pet.) ...............................................................29

*Guy Carpenter & Co. v. Provenzale*,
334 F.3d 459 (5th Cir. 2003) .........................................................................58

*Hartwell's Office World, Inc. v. Systex Corp.*,
598 S.W.2d 636 (Tex. Civ. App. –
Houston [14th Dist.] 1980, writ ref'd n.r.e.) ................................................50

*Hill v. McLane Co., Inc.*,
2011 WL 56061 (Tex. App. – Austin Jan. 5, 2011, no pet.) 26, 42, 48, *passim*

*Hunter Bldgs. & Mfg., LP v. MBI Global, LLC*,
436 S.W.3d 9 (Tex. App. – Houston [14th Dist.] 2014, pet. denied) .....35, 37

*IAC, ltd. v. Bell Helicopter Textron, Inc.*,
160 S.W.3d 191 (Tex. App. – Fort Worth 2005, no pet.)..................24, 25, 26

*Inex Indus., Inc. v. Alpar Resources, Inc.*,
     717 S.W.2d 685 (Tex. App. – Amarillo 1986, no writ) ...............................27

*In re Longview Energy Co.*,
     464 S.W.3d 353 (Tex. 2015) ..................................................................35

*International Brotherhood of Elect. Workers v. Becon Construct. Co., Inc.*,
     104 S.W.3d 239 (Tex. App. – Beaumont 2003, no pet.) .............................29

*Intercontinental Terminals Co., LLC v. Vopak North America, Inc.*,
     354 S.W.3d 887 (Tex. App. –
     Houston [1st Dist.] 2011, no pet.) .........................................................29, 30

*Kotz v. Imperial Cap. Bank*,
     319 S.W.3d 54 (Tex. App. – San Antonio 2010, no pet.)............................29

*Lasser v. Amistco Separation Prods., Inc.*,
     2014 WL 4952501 (Tex. App. –
     Houston [1st Dist.] Oct. 2, 2014, no pet.) .......................................................46

*Lynd v. Bass Pro Outdoor World, Inc.*,
     2014 WL 1010120 (Tex. App. – Dallas 2014, pet. denied).........................45

*Matrix Network, Inc. v. Ginn*,
     211 S.W.3d 944 (Tex. App. – Dallas 2007, no pet.) ....................................58

*Miller Paper Co. v. Roberts Paper Co.*,
     901 S.W.2d 593 (Tex. App. – Amarillo 1995, no pet.) ..........................49, 56

*Monsanto Co. v. Davis*,
     25 S.W.3d 773 (Tex. App. – Waco 2000, writ dism'd w.o.j.) .....................29

*Moreno v. Baker Tools, Inc.*,
     808 S.W.2d 208 (Tex. App. – Houston [1st Dist.] 1991, no pet.) ...............29

*Pinebrook Properties, Ltd. v. Brookhaven Lake Property Owners Ass'n*,
     77 S.W.3d 487 (Tex. App. – Texarkana 2002, pet. denied) ........................28

*Reach Group, LLC v. Angelina Group*,
173 S.W.3d 834 (Tex. App. – Houston [14th Dist.] 2005, no pet.) ........52, 53

*Reliant Hosp. P'ship, LLC v. Cornerstone Healthcare Group Holdings, Inc.*,
374 S.W.3d 488 (Tex. App. – Dallas 2012, pet. denied) ............................41

*Renewdata Corp. v. Strickler*,
2006 WL 504998 (Tex. App. – Austin 2006, no pet.)..................................42

*Rimkus Consult. Group, Inc. v. Budinger*,
2001 WL 619067 (Tex. App. –
Houston [14th Dist.] June 7, 2001, no pet.) ...........................................57, 58

*Rugen v. Interactive Business Systems, Inc.*,
864 S.W.2d 548 (Tex. App. – Dallas 1993, no pet.) ...................................24

*Salas v. Chris Christensen Sys., Inc.*,
2011 WL 4089999 (Tex. App. – Waco Sept. 14, 2011, no pet.) ...........50, 58

*Sharma v. Vinmar Int'l, Ltd.*,
231 S.W.3d 405 (Tex. App. – Houston [14th Dist.] 2007, no pet.) ..............57

*State v. Cook United, Inc.*,
464 S.W.2d 105 (Tex. 1971) ......................................................................29

*Stoner v. Thompson*,
553 S.W.2d 150 (Tex. Civ. App. –
Houston [1st Dist.] 1977, writ ref'd n.r.e.) ................................................29

*Texas Tech University Health Sciences Center v. Rao*,
105 S.W.3d 763 (Tex. App. – Amarillo 2003, pet. dismissed) ....................27

*Topheavy Studios, Inc. v. Doe*,
2005 WL 1940159 (Tex. App. –
Austin Sept. 14, 2005, no pet.) .............................................................26, 52

*Tranter, Inc. v. Liss*,
2014 WL 1257278 (Tex. App. –
Fort Worth March 27, 2014, no pet.).........................................................25

*Universal Health Serv. v. Thompson*,
    24 S.W.3d 570 (Tex. App. – Austin 2000, no pet.) ..........................33, 34, 51

*University Interschol. League v. Torres*,
    616 S.W.2d 355 (Tex. Civ. App. – San Antonio 1981, no pet.) ..................29

*Walling v. Metcalfe*,
    863 S.W.2d 56 (Tex. 1993) ...........................................................................51

*W.R. Grace & Co. v. Henson*,
    2007 WL 2389547 (Tex. App. –
    Corpus Christi Aug. 23, 2007, no pet.) ...................................................52, 53

## STATUTES AND RULES

12 C.F.R. § 1016, *et seq*. (Regulation P)...................................................................10

Tex. Civ. Prac. & Rem. Code § 134A.002(3) & (6)
(Texas Uniform Trade Secrets Act ("TUTSA")) .......................................36, 37, 47

Tex. R. Civ. P. 683................................................................... 20, 22, 23, 24, *passim*

## STATEMENT OF THE CASE

This is an interlocutory appeal from a Temporary Injunction that the district court issued in favor of Appellee, Ameripro, on June 16, 2015. CR 223-27.

Ameripro filed an application for injunctive relief and counterclaim against Appellants on April 1, 2015, for misappropriation, conversion, breach of fiduciary duty (and aiding and abetting those breaches), breach of contract (and tortious interference with contract), and conspiracy. CR 44-68. The district court granted a Temporary Restraining Order against Appellants on May 11, 2015. CR 95-98.

The district court conducted a two-day evidentiary hearing on Ameripro's application for temporary injunction on May 26-27, 2015. At the conclusion of the hearing, the district court orally granted Ameripro's application and dictated the parameters of the injunction. 3RR 208-14. The parties submitted forms of order. CR 160-81; CR 182-202; CR 207-22. The court entered a Temporary Injunction Order in favor of Ameripro on June 16, 2015, and entered a separate order denying Appellants' application for a temporary restraining order. CR 223-27; CR 228-29.

**STATEMENT REGARDING ORAL ARGUMENT**
**(ORAL ARGUMENT NOT NECESSARY)**

Appellee believes that the record clearly shows that the district court did not abuse its discretion in entering the temporary injunction at issue, and that oral argument is not necessary. The district court heard two days of evidence and had full briefing, and as cited below, ample evidence supports its issuance of the injunction. If the Court of Appeals grants oral argument, Appellee does not waive argument, but will appear and argue for affirmance.

# ISSUES PRESENTED

1.    Does the Temporary Injunction's list of reasons why there is imminent and irreparable injury — including Appellants' attempts "to permanently destroy Ameripro documents," their misappropriation of "confidential and proprietary information" from "Ameripro's computer network and premises," their commission of breach of contract and multiple torts, and the multiple findings of inadequacy and difficulty of quantifying damages — satisfy Rule 683 requirements, and does the evidence support those findings?

2.    Did the district court correctly determine that builders are "customers" of Ameripro under the contracts with Ameripro, in light of the evidence of Appellants' admissions, Ameripro's testimony, and the text of the contracts, and does evidence of Appellants' breach of fiduciary duty serve as an independent basis for the injunction?

3.    Are the Temporary Injunction's findings that Appellants misappropriated confidential information "stored on Ameripro's computer network," including "customer and referral lists and contact information," "pricing information," compilations of "builder preferences," "general ledgers," and other customer and financial data, supported by the evidence?

4.    Did the district court properly issue a Temporary Injunction despite Appellants' claim that they returned the confidential records prior to the hearing, in light of the evidence that they stripped out metadata from the copies of documents they returned, destroyed Ameripro client files after the TRO had issued, and their admissions that they still retained Ameripro records?

5.    Is there evidence to support the Temporary Injunction's findings that Ameripro "does not have a legal remedy that is adequate," that the full extent of its injury would "be very difficult to ascertain or quantify," that an award of damages "would not fully or adequately compensate Ameripro," and its related findings?

6.    Did the district court abuse its discretion in tailoring the terms of the injunction to track the threat of imminent and irreparable injury to Ameripro?

## I. Introduction: overview of the conduct which led to the injunction.

Appellee Ameripro Funding, Inc. ("Ameripro") is an Austin-based residential mortgage lender. 2RR 41-42, 44. By the nature of its lending business, Ameripro receives borrower loan applications, social security numbers, credit reports, and other confidential consumer information, the privacy of which is statutorily protected. 2RR 86, 143-45, 160-61, 169-72; 3RR 30, 39.

Appellants Michael H. Nasserfar, Michael E. Task, and Tycord R. Gosnay (the "Individual Appellants") are former agents and employees who worked at Ameripro's branch office in Lakeway, Texas. 2RR 45. Each of the Individual Appellants owed formal fiduciary duties to Ameripro during his employment with the company, including a duty of loyalty. 2RR 182-83, 194; 3RR 38-39, 58.

On January 15-16, 2015, the Individual Appellants resigned from Ameripro without prior notice. 2RR 52-54, 154; AX 2-4. The following Monday, they opened a new branch office for Ameripro's competitor, Appellant Oak Mortgage, in the same office complex. 2RR 60-61, 154; 3RR 31-32.

Ameripro subsequently discovered that the Individual Appellants had been secretly transmitting copies of its confidential records to Oak Mortgage, beginning *over two months* before they resigned (during a time when they were still fiduciaries for Ameripro). *E.g.*, 3RR 44-46 & AX 27. Oak Mortgage actively

1

solicited that information from the Individual Appellants, and scanned and downloaded copies of Ameripro reports onto Oak Mortgage's own computer network. 3RR 44-46, 127-28; 2RR 88-94; AX 27; AX 70 at 890-93.[1]

The Individual Appellants also secretly downloaded and printed Ameripro's confidential customer and financial records, and personnel files of other Ameripro employees, without Ameripro's (or the customers' or other employees') knowledge or authorization. 2RR 154-60, 170-75, 178, 184; 3RR 45-46, 127-28.[2] The Individual Appellants admitted that the Ameripro records were confidential, that they gave copies of those confidential records to Ameripro's competitor, Oak Mortgage, and that they continued to keep copies of all those records once they

---

[1] *See, e.g.*, 3RR 45-46 ("Q. Exhibit 27 is an example of AmeriPro's competitor asking you for confidential information without AmeriPro's knowledge, correct? A. Correct. They asked for information in that e-mail. … Q. You did give him a copy of a profitability report, didn't you? A. I don't remember the exact title of the report, but I gave him the report," adding that at a November 17, 2014 meeting "I did give him the report."); 3RR 46 (Nasserfar provided the report "in direct response to Oak Mortgage asking you for the profit and loss statement of AmeriPro"); 3RR 39-41 ("Question, Line 9: 'And earlier we talked about this, and you testified that a general ledger would be confidential; is that correct?' Answer: 'A general ledger would be confidential information.' … Question: 'So your testimony is that either you or Mr. Task provided Exhibit 12 [AX 28], which is the general ledger by branch to Oak Mortgage?' Answer: 'Correct.'").

[2] *See, e.g.*, 2RR 156-57 ("Q. You didn't ask anyone's permission at AmeriPro to take this information home with you, did you? A. I did not. … Q. The day before – the day before you resigned from AmeriPro, you filled a bankers box with these monthly general ledgers and several other Ameripro financial records to take with you, correct? A. I made copies. … Q. And you had copies of personnel records of other employees of AmeriPro at your house even after you resigned from the company, correct? A. I had copies, correct."); 2RR 174-75 (downloaded Ameripro's confidential financial records "off of AmeriPro's computer network that you had to access through a password"); 2RR 184 ("Q. You never once asked any of the consumers, whose information you took home with you, you didn't ask any of them for permission to take their financial nonpublic data home with you, did you? A. I did not.").

2

became officers and agents of Oak Mortgage. 2RR 163-71, 174-75, 177-78, 183-84; 3RR 39-41; *see also* 2RR 80-81.[3] At the hearing, Appellants' counsel told the district court that Appellants "returned over 20,000 – I think it's *over 20,000 electronic files*" to Ameripro on April 27, 2015 alone. 2RR 22.

In addition to taking customer data from Ameripro's computers, the Individual Appellants also began secretly soliciting customers on behalf of Oak Mortgage, despite their fiduciary relationships and non-solicitation agreements with Ameripro. One month before they resigned, Oak Mortgage instructed them that they could "solicit to your book of business and your builder/realtor relationships" and "solicit to your past customer database." 2RR 191-93; AX 56. They proceeded to do so. In December 2014, for example, Nasserfar reported to Oak Mortgage that he was driving almost 200 miles to contact all Ameripro builder customers — even though he was still serving as a Branch Manager and fiduciary for Ameripro at that same time. 3RR 58; AX 63.[4]

---

[3] *See, e.g.*, 3RR 127-28 ("Q. You gave copies of that bankers box full of financial information from AmeriPro to Mr. Gosnay to scan at Oak Mortgage's offices, correct? A. We scanned them, correct."); 2RR 155-56 ("Question: 'And you knew you still had those AmeriPro financial records, those confidential records, ever since you've resigned, correct? It's not something you just forgot you had?' Answer: 'No, I had not forgotten.'").

[4] 3RR 58 ("Q. And you told Oak Mortgage, the competitor of the company you were working for, that you had driven almost 200 miles and were dropping in on all builder contacts, correct? A. Correct. Q. You were still under a duty of loyalty to AmeriPro at that time, correct? A. Yes, sir.").

## II. Ameripro's creation of the Lakeway branch office, and the Individual Appellants' fiduciary roles for Ameripro.

Ameripro was founded as a residential mortgage lending company in 2003, headquartered in Austin. 2RR 41-42.

At the request of Michael Nasserfar, Ameripro created a branch office in Lakeway, Texas, in 2014. 2RR 46-47. Ameripro promoted Nasserfar to be its Branch Manager at that location. 2RR 47. Michael Task served as Sales Manager, and Tycord Gosnay served as a Loan Officer and agent, at the same location. 2RR 45. The Individual Appellants were Ameripro's only three employees at its Lakeway office. 2RR 45.

## III. The non-solicitation clauses and ownership provisions in the Ameripro contracts.

As a condition to their employment, and before they could receive access to any of Ameripro's confidential information, the Individual Appellants were required to sign employment and confidentiality agreements with Ameripro. 2RR 63, 77. The Individual Appellants contractually agreed:

(a)    that Ameripro is the exclusive owner of all information they created or to which they were given access during their employment,

(b)    that they would protect the confidentiality of all such information, and would not use or disclose it except to perform their duties, and

(c)    that upon their termination, they would return all such information to

4

Ameripro, and would not retain any portions for any purpose.

AX 7-11, 13-19, 21-24.

### A. Ameripro's confidential information includes each category outlined in the Temporary Injunction.

After the Individual Appellants signed their employment contracts, Ameripro gave them access to confidential information, including the records listed in the Temporary Injunction. 2RR 66-67, 70-71, 80-82, 88-94, 142-43, 183-84. That information would give others a competitive advantage if used or disclosed, and Ameripro had multiple security systems in place to protect its secrecy, including consumer data. 2RR 66-68, 70-71, 81-82, 89-91, 99, 143.

Ameripro never gave them permission to take or disclose any of its information, let alone to a competitor. 2RR 81-82, 88-89, 92-94.

### B. Brohn, Clark Wilson, and Seaholm were Ameripro's customers under the contractual non-solicitation clauses.

Although Appellants argue that "customers" under the Ameripro contracts does not include builders, Nasserfar admitted that part of his job at Ameripro was to build goodwill with Ameripro's "builder customers," and stated that Ameripro was the "exclusive lender" for Brohn and Clark Wilson. 3RR 50-53; AX 67. Likewise, Task understood that Ameripro's "customers" as used in the contracts he signed included its builders and other referral sources, whom he was contractually barred from soliciting, and admitted that Ameripro's "clients"

included builders. 2RR 185-86; AX 55. Nasserfar admitted that he developed a "builder centric model" for Ameripro. 3RR 48-50; AX 75.

Builders Brohn Homes, Clark Wilson Builders, and Seaholm Residences, in particular, were customers of Ameripro. 2RR 50, 69-70, 100-02; 3RR 51-52, 67-68.[5] Nasserfar and Task did not have a customer relationship with them until after they were employed at Ameripro. 2RR 100-02, 201; 3RR 67-68, 177-78. Prior to when Nasserfar and Task resigned from Ameripro, neither did Oak Mortgage. 2RR 52.

Nasserfar and Task contractually agreed that for one year following their termination, they would not solicit similar business from "any customer" who was doing business with Ameripro as of his termination, or "otherwise knowingly interfere with the business of the Company." AX 11, AX 17.

Each of the Individual Appellants also contractually agreed that "all leads and loans in process are Company's property," they would not take any action to divert loan business "to a competitor or away from Company," and they would provide Ameripro a "written account of any and all open leads, business prospects, and/or loans in process as of the date" of his termination. AX 11; AX 17-18.

---

[5] *E.g.*, 2RR 100-102 (Brohn became a "customer of Ameripro," and identifying Seaholm as a customer); 3RR 51-52 (Nasserfar admits Ameripro was the lender for Clark Wilson and Brohn Homes); 2RR 50 (Ameripro's business relationship with "builders or other corporate customers").

**C.     Oak Mortgage's actual knowledge of the contract provisions**.

At least as early as December 10, 2014 (more than one month before the Individual Appellants resigned from Ameripro), they gave Oak Mortgage copies of their employment agreements with Ameripro, which Oak Mortgage reviewed. AX 56.  Oak Mortgage consequently had actual knowledge of the confidentiality, exclusive ownership, and non-solicitation provisions in the Ameripro contracts.

**IV.     The Individual Appellants admitted that they took Ameripro's confidential information and provided it to Ameripro's competitor. They began doing so months before they resigned.**

Oak Mortgage is a direct competitor of Ameripro.  2RR 60.  Prior to 2015, it did not have an office in the Austin area.  3RR 32-33; 2RR 60.  In September 2014, Nasserfar began negotiating with Oak Mortgage about becoming its branch manager at the same location where he managed Ameripro's branch.  3RR 43.

More than two months before the three Ameripro fiduciaries resigned, Nasserfar began funneling copies of Ameripro's confidential information to Oak Mortgage.  On November 12, 2014, for example, Oak Mortgage's Senior Vice President e-mailed Nasserfar that Oak Mortgage "will need some more information from you," including Ameripro's product mix and detailed breakdowns, "compensation" of other Ameripro employees, copies of Ameripro's 2013 and 2014 profit and loss statements (so Oak Mortgage would know the "monthly expenses"), and Ameripro "Pricing" on deals so Oak Mortgage could

7

"compare it to our pricing." AX 27; 3RR 44-45.

Nasserfar admitted that "AmeriPro's competitor [was] asking you for confidential information without AmeriPro's knowledge," and that he provided it to Oak Mortgage. 3RR 45-46; AX 70 at 890-93. At least one month before they resigned as fiduciaries, the Individual Appellants also transmitted an electronic copy of Ameripro's Loan Profitability Report to Oak Mortgage, listing Ameripro's revenues and margins for every loan at its Lakeway branch, together with consumer names and account numbers. Oak Mortgage then analyzed the report for several hours on December 17, 2014. AX 49-50; 2RR 230-32.

### A. Appellants also downloaded and copied Ameripro's financial and customer data from its office and computers.

In the month before they resigned, the Individual Appellants also removed electronic and paper copies of virtually every category of confidential financial and customer information from Ameripro's Lakeway office. Testimony at the hearing established:

i) The day before they resigned, Task filled a bankers box full of Ameripro financial records for the past year. He and Gosnay scanned them at Oak Mortgage's offices. 2RR 156-57; 3RR 127-28.[6] Task admitted his

---

[6] 2RR 156-57 (Task "filled a bankers box with these monthly general ledgers and several other Ameripro financial records to take with you."); 3RR 127-28 ("Q. You have copies of that

8

contracts barred him from taking the records, but he took them anyway, without Ameripro's knowledge. 2RR 158-59, 166-67, 174.

ii) Nasserfar likewise downloaded Ameripro confidential documents onto a USB device, and kept it when he became Oak Mortgage's Vice President. 2RR 178.

iii) Appellants also downloaded confidential profit and loss reports from Ameripro's computer network. 2RR 177-78.[7]

iv) Appellants took electronic and hard copies of Ameripro's monthly general ledgers for 2014, admitted that the ledgers were Ameripro's confidential information, and admitted that they gave the ledgers to Oak Mortgage. 2RR 156-57, 164-65; 3RR 42.[8] Oak Mortgage even produced copies in discovery. AX 28; PX 6.

v) Task and Nasserfar "intentionally" took lists of Ameripro borrowers (including their social security numbers) when they resigned from

---

bankers box full of financial information from AmeriPro to Mr. Gosnay to scan at Oak Mortgage's offices, correct? A. We scanned them, correct.").

[7] 2RR 177-78 ("Q. The day before you resigned from AmeriPro, you also took copies of its profit and loss reports off the computer system, correct? A. Correct," but he is not sure of date).

[8] 2RR 156-57 (they took Ameripro's "monthly general ledgers"); 3RR 42 ("Q. And you answered 'correct' when she asked you if you or Mr. Task gave it [AX 28] to Oak Mortgage, correct? A. Correct."); 2RR 164-65 ("Q. And then the question: 'This is information you obtained electronically on AmeriPro's computer network, correct?' Answer: 'Correct.' … Question: 'And you understood then that it was AmeriPro's confidential information that you have in these general[] ledgers, correct?' Answer: "I would agree.'").

Ameripro. Task admitted that they obtained those records from Ameripro's secure network, and that federal regulations barred them from doing so. 2RR 160-61, 167-72; 12 C.F.R. § 1016, *et seq.*[9] They also failed to obtain permission from any of the borrowers before removing their private financial information from Ameripro. 2RR 184.[10]

vi) Appellants downloaded still other borrower information onto a thumb drive, including nonpublic lists of loans that had not closed yet, and admitted that federal regulation barred that conduct. 2RR 170-71.[11] Nasserfar sent a similar "pipeline" report of unclosed Ameripro loans to

---

[9] 2RR 160-61 ("Q. Now, both you and Mr. Nasserfar intentionally took list of AmeriPro borrowers including their loan numbers and other financial information with you when you resigned from AmeriPro, correct? A. Correct."); 2RR 168-69 ("Q. You understood that the social security number of a borrower of AmeriPro is confidential information, didn't you? A. I understand that. Q. And you understand that federal regulations prohibits you from taking that information, don't you? A. I do now, yes, sir."); 2RR 171-72 ("Q. All of the information you took when you resigned relating to AmeriPro borrowers was information you obtained off of AmeriPro's computer system, correct? A. Correct. Q. You didn't obtain any of that information from public sources, did you? A. No. … Q. Under Regulation P, you derived that information from something a borrower submitted to the lender. You're not allowed to take that. It's protected too. Do you understand that? A. I do now. … Q. You took it all off of AmeriPro's protected website and computer network, correct? A. From their network.").

[10] 2RR 184 ("Q. You never once asked any of the consumers, whose information you took home with you, you didn't ask any of them for permission to take their financial nonpublic data home with you, did you? A. I did not.").

[11] 2RR 170-71 ("Q. And the day before you resigned from AmeriPro, you also, in addition to this bankers box, downloaded on a thumb drive information about a AmeriPro borrowers and loans that hadn't even closed yet, correct? A. Correct. … Q. And you understand that under Regulation P that's nonpublic private financial information of those borrowers that you had in your possession, correct? A. I had it in my possession. Q. And you took it home too, correct? A. Correct."). As quoted above, they scanned the entire box of records at Oak Mortgage.

10

Oak Mortgage, also in violation of federal regulations. 2RR 85-86.

vii) Appellants took Ameripro's Funded Loan Report for 2014, which included the names of each consumer whose loan was processed through Ameripro's Lakeway branch, their account numbers, and the fees they paid, in violation of federal regulations. 2RR 92-93.[12] Oak Mortgage produced a copy in discovery. AX 30; PX 7; 2RR 92.

viii) The Individual Appellants printed and gave Oak Mortgage a copy of Ameripro's Statement of Income reports for 2014. Oak Mortgage produced copies in discovery. AX 29; AX 33-34; PX 5; 2RR 91-92.

ix) Task took copies of Ameripro's internal pro forma reports, outlining Ameripro's future plans for the Lakeway office. 2RR 183-84.

x) On January 13, 2015 (the day before he resigned, and while still a fiduciary), Gosnay downloaded and e-mailed to his personal gmail account a copy of Ameripro's computer compilation of contact information and loan preferences for three Ameripro builder customers, including Brohn Homes and Clark Wilson Builders, their fees and tax rates (broken down by community), working capital, and closing

---

[12] 2RR 92-93 ("Q. So is it your understanding these [AX 28-30] were produced in discovery by Oak Mortgage? A. Yes. Q. Okay. Any reason – any legitimate reason why Oak Mortgage should have these exhibits like Exhibit 30? A. No." It included borrower names, "all the

11

preferences, requirements, and nonpublic lender credit arrangements Ameripro made with those customers. He also downloaded and sent to his personal e-mail Ameripro rate information, and Ameripro templates and forms. AX 35-36, 38; 2RR 93-94, 96-98.

Appellants knew they did not have Ameripro's consent to take its information, and knew that their contracts prohibited it. 2RR 158-59, 170-71.[13]

In their haste in downloading and using Ameripro's documents, Appellants even forgot to remove Ameripro's address from the templates they took. Appellants began using exactly the same forms at their new business, with Oak Mortgage's logo, but with Ameripro's address still affixed. 2RR 96-98; *compare* AX 36 (the attachment Gosnay e-mailed to his gmail account) with AX 37.

## B. The confidential information that Appellants took from Ameripro enabled them to jumpstart a competing office.

Access to Ameripro's records and data would give a competitor "a head start in starting a new location" in an accelerated time frame. 2RR 81, 90, 99. For example, it took 10-12 months of time and expense to launch Ameripro's Lakeway

---

revenue associated to the specific loan," expenses specifically related to it, and "total loan/income," and that "None of that is publicly available.").

[13] 2RR 158 ("Q. You chose not to comply with your contract provisions with AmeriPro and took its financial information and borrower list to your house instead, correct? A. I made copies."); 2RR 170-71 ("Q. You knew that you were taking AmeriPro information home with you for a purpose other than what AmeriPro had given you consent for, correct? A. Correct.").

office. 2RR 47-48. In contrast, after misappropriating substantially all of that data, Appellants were able to open a new branch in the same complex within one business day after the Individual Appellants resigned. 3RR 31-32; 2RR 154.

Similarly, Ameripro developed its proprietary forms over the course of twelve years. 2RR 98-99. By simply downloading all of that information *en masse*, Appellants were able to use the product of Ameripro's forms, templates, and customer compilations the same month they opened their branch. AX 35-38.

By transmitting the details of Ameripro's builder preferences, lender credits for loans, product mix, pricing, rates, fees, margins, and other internal records to a competitor (e.g. AX 27-38), Appellants consequently had the benefit of that data when they solicited Ameripro's customers at their jumpstarted branch. The builder customer data, in particular, would aid a competitor in soliciting Ameripro customers because it would show the type and amount of business obtained through each builder. 2RR 70-71.

**V.    Appellants began soliciting Ameripro's customers for Oak Mortgage, even before the Individual Appellants had resigned from Ameripro.**

**A.    One month before the Individual Appellants resigned as fiduciaries, Oak Mortgage agreed to indemnify them against Ameripro, and told them they could solicit its customers.**

On December 10, 2014 (over one month before the Individual Appellants resigned from their fiduciary roles at Ameripro), Oak Mortgage wrote Nasserfar

13

and Task that it had reviewed their employment agreements, and that they could "solicit to your book of business," solicit their "past customer database," and solicit from the "builder/realtor relationships." 2RR 191-93; AX 56.

The next day, December 11, 2014, Oak Mortgage agreed to indemnify them in litigation with Ameripro. 2RR 193; AX 53; AX 81.[14] They nevertheless continued to serve as fiduciaries at Ameripro for a full month. 2RR 182-83, 194.[15]

**B.**     **While they were Ameripro's fiduciaries, the Individual Appellants began soliciting Ameripro customers for a competitor. Oak Mortgage sent "scripts" for them to use**.

One week after Oak Mortgage told Ameripro's employees they could solicit its "customers," Nasserfar e-mailed Task a list of major Ameripro builder customers, including principal employees. AX 59. A few days later, Nasserfar e-mailed Oak Mortgage and reported he was "dropping in on all builder contacts," driving almost 200 miles to do so. AX 63. Nasserfar admitted he reported his progress to "the competitor of the company you were working for," at a time when

---

[14] AX 53 and AX 81 are Oak Mortgage's Offer Package to Nasserfar and Task, and state: "Per the phone conversation held on December 11, 2014," Oak Mortgage Group "agrees to provide Michael with legal support and protection ('Legal Support and Protection') in the event a law suit is filed against Michael by Michael's previous employer, AmeriPro Funding, Inc. … by covering the cost of Michael's legal fees associated with defending the law suit filed by Ameripro."

[15] 2RR 182-83 ("Q. After the December 11 conversation, you continued working as a fiduciary for AmeriPro for another month, correct? A. I did continue to work for AmeriPro for another month, yes. … Q. And not only were you a fiduciary for AmeriPro, you were also the co-manager at the Lakeway branch for that full month, correct? A. Correct.").

Nasserfar admitted he still owed a duty of loyalty to Ameripro itself. 3RR 58.[16]

On January 8, 2015, while Nasserfar was still a fiduciary to Ameripro, Oak Mortgage also sent him "scripts" to use for "All previous clients & database," "Borrowers in Pipeline," "Realtors in Pipeline," and "All other Realtors." AX 78. Nasserfar also contacted principals and employees of Ameripro's existing customers about his plan to open a competing office with Oak Mortgage – at the same time Nasserfar was paid by Ameripro to help build goodwill with those same builder customers. 3RR 53, 58-59, CX 1 at 15-16. Despite the non-solicitation provisions in his contracts with Ameripro, Nasserfar prepared a "To Dos" list on January 5, 2015, which included drafting a "new intro email to be sent to clients (both new and old)," and continued to notify Ameripro customers (but not Ameripro itself) about his plans. AX 58, 80; 3RR 55-57, 60-61.[17] As noted above, Gosnay downloaded customer compilations and forms and e-mailed them to his personal account. AX 35-36, 38.

Although the Individual Appellants contractually agreed that Ameripro

---

[16] 3RR 58 ("Q. And you told Oak Mortgage, the competitor of the company you were working for, that you had driven almost 200 miles and were dropping in on all builder contacts, correct? A. Correct. Q. You were still under a duty of loyalty to AmeriPro at that time, correct? A. Yes, sir."). Nasserfar sent that update in response to Oak Mortgage's e-mail about celebrating their "next chapter" and "all the work put in to serve all those clients, referral partners!" AX 63.

[17] At 3RR 60-61, Nasserfar was impeached with his prior testimony, in which he admitted that a text from one such customer went to him personally. Nasserfar then testified that he never saw

15

owned "all leads" (AX 11; AX 17-18), they also met with business prospects while they fiduciaries of Ameripro (but to benefit Oak Mortgage, not Ameripro), and scheduled future meetings to occur on dates when they would be working at Oak Mortgage. AX 60-62, 2RR 203-05.

Despite the non-solicitation clause in Nasserfar's and Task's contracts, Oak Mortgage also e-mailed them instructions on how to evade detection of such violations. For example, Oak Mortgage e-mailed Nasserfar and Task on January 8, 2015: "Just have Ty [Gosnay] resign PRIOR to the Michaels. As long as he resigns before we are ok. … Wait 1 month before you go after the other person." AX 57; 2RR 196-97.[18]

**VI.** **In addition to transmitting confidential data to Oak Mortgage before they resigned, the Individual Appellants removed *over 20,000 Ameripro customer and financial files* and kept them as agents of Oak Mortgage.**

On January 19, 2015, Nasserfar became the Vice President for Oak Mortgage, Task became Oak's Mortgage's Austin Area Sales Manager, and Gosnay became its Mortgage Banker in Austin. As of that date, they were Oak Mortgage's entire sales force in Austin. AX 67; AX 69; AX 81.

---

it. On the face of AX 58, however, Nasserfar not only received the text but also *responded* to it, and the context makes clear he had previously advised the customer about his competing office.

[18] 2RR 196-97 (Task impeached: "Q. Question: 'Is there any business reason that you can think of about waiting one month before you go after the other person, other than to make it appear that it's not a solicitation?' Answer: 'You'd have to ask him. No.'").

Once they formally became officers and agents of *Oak Mortgage*, they continued to keep possession of all of the confidential and customer data they had taken from Ameripro's computer network and offices. 2RR 54, 75-78, 159, 178.

Counsel for Appellants told the district court that "on April the 27th [2015] we returned over 20,000 – I think it's *over 20,000 electronic files* to them." 2RR 22 (emphasis added). Those 20,000+ Ameripro files were "returned" only after Ameripro filed applications for injunction to get back its internal files. CR 44-68.

Task returned the bankers box of records even later, on May 5, 2015 (six days before the initial injunction hearing). PX 34; CR 95-98. After the district court issued a TRO on May 11, 2015, Appellants produced still more Ameripro records they had stored on ten different thumb drives, laptops, and external storage devices, but stripped out the system metadata. AX 48; 2RR 226-27. Appellants had the use of those thousands of Ameripro records during the intervening months.

**VII. The Individual Appellants destroyed Ameripro documents, including its customer files, and destroyed files after the district court issued a TRO compelling their return.**

Appellants discussed the prospect of litigation with Ameripro at least as early as December 11, 2014, when Oak Mortgage agreed to indemnify them. AX 53; AX 81. Task nevertheless manually deleted all of his text messages through January 20, 2015, after he left the company, including all of the texts he

17

exchanged with Ameripro customers and the other Appellants. 2RR 182-83.[19]

On January 15, 2015 (the day before he resigned), Task also inserted a USB device in the laptop Ameripro had issued to him for work, to download the documents stored on it, and then deleted 911 "ameriprofunding-clients" files from the laptop before giving it back to Ameripro. 2RR 217-21; AX 3 (laptop return); AX 43 (expert analysis). Task had previously moved those files to the local drive of the laptop, so that information would not be backed up on Ameripro's network, would not be accessible to its IT personnel, and documents transmitted to Oak Mortgage could not be detected. 2RR 174, 219.[20]

Appellants also destroyed documents subject to the TRO. The TRO issued on May 12, 2015. CR 95-98. Two days later, Appellants deleted 140 folders from a USB hard drive labeled "Nasserfar External Drive." 2RR 233-36; AX 46. The pathnames for the deleted folders show they were part of what the TRO commanded to be returned to Ameripro, including: "AMB Loan Funded Report Jan-Aug" files, "AMB Profit & Loss Jan-Aug" files, "APF Accounting System

---

[19] 2RR 182-83 (Task knew of prospective litigation with AmeriPro on December 11, 2014, and admitted: "Q. And after that, you deleted every text message that existed before then, all the way through January 20, after you left the company, correct? A. Yes.").

[20] 2RR 174 ("Q. – Ameripro wouldn't be able to tell if you sent it, for instance, to Oak Mortgage, would it? A. They would not have been able to, I guess. Q. So by having it on the local drive of your computer, you were able to send it any where you want without being detected, correct? A. If I chose to, I believe.").

Loan Details '14," "Monthly Pipeline Details," and "Loan_files" and "Loan Details" for several months. AX 46.

## VIII. Appellants' successful disruption of Ameripro's business.

When the Individual Appellants left Ameripro, they still had loans in the process of being closed. CX 1 at 18. Despite the clause in their contracts regarding being "available to help with and participate in the closing process when requested" (AX 11, AX 17-18), the Individual Appellants did not return telephone calls or cooperate on the transition of the pending loans. 2RR 53, 55; 3RR 56.

The Individual Appellants' contracts also required them to provide a "written account" of all open leads, business prospects, and loans in process as of their termination. AX 11, AX 17-18. Those provisions were designed to "make a smooth transition for the current customers in the company's pipeline." 2RR 78-79. They did not provide those lists, however, and did not inform Ameripro of their conversations with borrowers. 2RR 55-56, 79-80. One major builder described the impact that the breach had on Ameripro's goodwill, including that "there's been a much higher level of complaint" for the loans Nasserfar handled and left, some of the loans did not close, and in the resulting confusion Ameripro was rated "very low" on borrower surveys relating to those loans. CX 1 at 19-21.

In sum, Appellants took the entirety of Ameripro's confidential financial and customer data for the Lakeway branch, and used Ameripro's confidential

information to compete for the very customers they had contractually agreed not to solicit. Ameripro's pipeline of business at the Lakeway office fell off dramatically, and its Lakeway branch closed down. 2RR 45-46.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in entering the Temporary Injunction. This is a case of blatant misappropriation of Ameripro's confidential information and solicitation of its customers for a competitor, which began at the behest of Oak Mortgage while the Individual Appellants were still fiduciaries of Ameripro. The evidence amply supports that each of the Appellants conspired and participated in those violations of common law, statute, and contract.

Appellants' argument that the Temporary Injunction does not provide "any explanation or description" to satisfy Rule 683 is without merit. Nowhere in Appellants' brief do they mention the Temporary Injunction findings that they attempted to "permanently destroy Ameripro documents and files," removed "confidential and proprietary information belonging to Ameripro," took builder customer and other confidential data from "Ameripro's computer network and premises," or the multiple specific findings regarding imminent irreparable harm. Case law shows that the district court's reasons satisfy Rule 683.

Appellants' own testimony confirms that the three builders listed in the

20

Temporary Injunction are "customers" of Ameripro, including under the non-solicitation provision of the contracts. That evidence is consistent with the contract language as well.

Appellants did not merely take names of builders from Ameripro. Appellants misappropriated Ameripro's confidential compilations of multiple categories of pricing, customer, and financial data (including those listed in the Temporary Injunction, none of which Appellants mention or address in their brief). They downloaded that data from Ameripro's computers. Independent of the non-use, non-disclosure, and non-solicitation provisions of the contracts, their conduct was an egregious breach of fiduciary duty, in which Oak Mortgage knowingly participated, and independently supported issuance of an injunction.

The record establishes that Appellants had not returned all of Ameripro's confidential information as of the hearing. Instead, Appellants destroyed documents after the TRO issued, stripped out metadata from copies they "returned," and still retained documents. Even for the documents they did return, their wrongful retention and use of thousands of that information in a competing business for several months separately supports issuance of the injunction.

The evidence supports the district court's multiple findings that Ameripro does "not have a legal remedy that is adequate," that damages "would not fully or adequately compensate Ameripro" and would be "very difficult to ascertain or

21

quantify," and related findings about the inadequacy of any remedy at law. Appellants do not mention or address those findings anywhere in their brief, or any of the evidence relating to them.

The district court narrowly tailored the Temporary Injunction, and its exercise of discretion in fashioning the injunctive relief is tied to the imminent irreparable harm as shown by the evidence.

**ARGUMENT**

## I. The Temporary Injunction satisfies the requirements of Rule 683.

Appellants argue that the Temporary Injunction states mere conclusions and does not provide "any explanation or description" why an injunction is needed to prevent irreparable injury to Ameripro. [App. Br. 25.] Based on that false premise, they argue that the Temporary Injunction does not comply with Rule 683.

### A. The reasons for issuance stated in the Temporary Injunction, which Appellants do not address or even mention in their brief.

Appellants' argument is false on its face. The Temporary Injunction states that Appellants "attempted to permanently destroy Ameripro documents," that they "have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro," and it itemizes several categories of confidential customer and financial files that Appellants wrongfully took from "Ameripro's computer network and premises," including "customer and

22

referral lists," "builder preferences," and multiple categories of internal financial data ranging from Ameripro's "general ledgers" to its "pricing information." CR 223-24. The Temporary Injunction expressly adds:

> "The Court further finds, based upon the evidence, that Ameripro has met its burden to establish that it will <u>suffer a probable, imminent, and irreparable injury</u> until trial on the merits, absent entry of a temporary injunction, <u>in that</u> Ameripro has shown that <u>the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify, a future award of damages would not fully or adequately compensate Ameripro, Ameripro does not have a legal remedy that is adequate in lieu of injunctive relief, and even to the extent that a legal remedy might be available, its redress will be limited and inadequate</u>. The Court further finds that the balancing of the equities as between Ameripro and Counter-Defendants … favors the issuance of this temporary injunction, and that <u>this temporary injunction is necessary to preserve the status quo between the parties pending trial on the merits</u>."

CR 224 (emphasis added).

None of the foregoing detailed reasons — stated directly in the Temporary Injunction — are mentioned anywhere in Appellants' brief. Appellants simply ignore them. Their argument that the Temporary Injunction does not give "any explanation or description" of its reasons is without merit.

**B.     The reasons stated in the Temporary Injunction go further than is required by Rule 683, as shown by multiple decisions.**

As a matter of law, the reasons set out in the Temporary Injunction satisfy Rule 683 requirements, as illustrated by multiple decisions (including those cited by Appellants).

23

In *IAC, ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191 (Tex. App. –

Fort Worth 2005, no pet.), the court rejected a similar challenge under Rule 683.

In affirming a temporary injunction, the *IAC* court stated:

> "When a defendant possesses trade secrets and is in a position to use
> them, harm to the trade secret owner <u>may be presumed</u>. [Citations
> omitted.] The threatened disclosure of trade secrets <u>constitutes
> irreparable injury as a matter of law</u>."

160 S.W.3d at 200 (emphasis added). In fact, "At times, an injunction is the <u>only</u>

effective relief an employer has when a former employee possesses confidential

information." *Rugen v. Interactive Business Systems, Inc.*, 864 S.W.2d 548, 552

(Tex. App. – Dallas 1993, no pet.) (emphasis added).

Just as importantly, the *IAC* court noted that the same reasons contained in

the Temporary Injunction satisfied Rule 683: "The injunction further states that

Bell's injury is irreparable because 'it cannot be adequately compensated in

damages or the damages cannot be measured by any pecuniary standard' and that

'a legal remedy may be also inadequate since an award of damages may come too

late.' Accordingly, we hold that the injunction adequately sets forth the reasons

for its issuance by identifying Bell's harm and explaining why it is irreparable."

160 S.W.3d at 201.[21]

---

[21] Here, Appellants actually used Ameripro's confidential information. Oak Mortgage
analyzed a copy of Ameripro's profitability report for several hours, even while the Individual
Appellants (who supplied the report) were still Ameripro fiduciaries. AX 49-50; 2RR 230-32.

Here, the Temporary Injunction includes the reasons found sufficient in *IAC*, but also recites much more egregious conduct. For example, Appellants' attempts to "<u>permanently</u> destroy Ameripro documents and files," and their possession of confidential information belonging to Ameripro, describe threats of irreparable injury as a matter of law.[22]

So too does the Individual Appellants' breaches of contract, with which Oak Mortgage tortiously interfered. CR 223. *Tranter, Inc. v. Liss*, 2014 WL 1257278 *9 (Tex. App. – Fort Worth March 27, 2014, no pet.) (quoting with approval, "'In Texas, injury resulting from breach of non-compete covenants is the epitome of irreparable injury."). The Temporary Injunction also found that Appellants took Ameripro's "customer and referral lists and contact information," compilations of "builder preferences," its "pricing information," and other specific examples of customer and financial data which would epitomize irreparable harm if placed in the hands of a competitor. CR 224.

Even if the district court had not explicitly found the likelihood that

---

*Compare: Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App. – Fort Worth 2003, no pet.) ("TWI is not required to prove that Fox is actually using the information; it need only prove that he is in possession of the information and is in a position to use it").

[22] The record supports those reasons as well. 2RR 217-21 & AX 43 (over 900 "ameriprofunding-clients" files destroyed from Ameripro laptop); 2RR 233-36 & AX 46 (140 "loan files," "pipeline," and other Ameripro files destroyed); 2RR 182-83 & AX 53 (Task manually deleted all text messages that existed during his employment, after Oak Mortgage agreed to indemnify him in litigation against Ameripro).

Appellants engaged in misappropriation and destructive behavior, their wrongful *acquisition* of Ameripro's confidential information, by itself, also gives rise to a presumption of irreparable harm. *Hill v. McLane Co., Inc.*, 2011 WL 56061 *5 (Tex. App. – Austin Jan. 5, 2011, no pet.) (where appellant "acquired" trade secret information, a plaintiff "need not demonstrate" actual misappropriation before trial, and "[i]nstead, 'harm to the trade secret owner may be presumed," citing *IAC*); *Conley v. DSC Commun. Corp.*, 1999 WL 89955 *5 (Tex. App. – Dallas Feb. 24, 1999, no pet.) (although "no evidence shows any misconduct" by a former employee, that did "not change the fact that the employee is in possession of confidential, proprietary information," and did "not bar the trial court from entering a temporary injunction.").

Moreover, the Temporary Injunction findings that i) "the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify," ii) a future award of damages "would not fully or adequately compensate Ameripro," iii) Ameripro "does not have a legal remedy that is adequate in lieu of injunctive relief," and iv) "even to the extent that a legal remedy might be available, its redress will be limited and inadequate," are independent reasons why irreparable harm would result which satisfy Rule 683, and as shown in Section V below, are fully supported by the record. *Topheavy Studios, Inc. v. Doe,* 2005 WL 1940159 *6 (Tex. App. – Austin Sept. 14, 2005, no

26

pet.) ("A party proves irreparable harm by showing an injury for which there can be no real legal measure of damages or for which damages cannot be ascertained with a sufficient degree of certainty.").

In sum, the district court's reasons for issuance, as stated in the Temporary Injunction, are much more detailed than Rule 683 requires. *See also Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387, 397 (Tex. App. – Austin 2000, no pet.) (injunction satisfied Rule 683 when it stated the appellant misrepresented itself with intent to interfere, and in the same order, stated that "without the issuance of this temporary injunction, said Defendant will alter the status quo and Plaintiffs will be without any adequate remedy at law"); *Inex Indus., Inc. v. Alpar Resources, Inc*., 717 S.W.2d 685, 688 (Tex. App. – Amarillo 1986, no writ) (cited with approval by this Court in *Amalgamated* as holding "the trial court sufficiently stated its reasons 'that Wallace and Inex would, if allowed to continue, alter the status quo, tend to make ineffectual a judgment in favor of Alpar, and leave Alpar without an adequate remedy at law,'" and that "these recitations were held to satisfy Rule 683 as interpreted by the supreme court"); *Texas Tech University Health Sciences Center v. Rao*, 105 S.W.3d 763, 768 (Tex. App. – Amarillo 2003, pet. dismissed) ("a recitation of the reasons an injunction issued was because the defendants had no adequate remedy at law, the rights involved were unique and irreplaceable, and money damages would not be a sufficient remedy were

27

sufficient to meet Rule 683 requisites," and adding, "We agree with that holding") (citing *Pinebrook Properties, Ltd. v. Brookhaven Lake Property Owners Association*, 77 S.W.3d 487, 504-05 (Tex. App. – Texarkana 2002, pet. denied)).

**C.**   **The decisions cited by Appellants do not assist them.  One such decision lists the language from this Temporary Injunction as examples that "*comply* with rule 683."**

The authority that Appellants cite at pages 22-24 of their brief actually defeat their argument:  one decision listed *some* of the same reasons contained in this Temporary Injunction, and described them as examples that have "been held sufficient to comply with rule 683."  The remaining decisions that Appellants cite are inapposite — the language in those orders did not recite any reasons at all, and in several instances did not even mention the word "injury."

Appellants cite *Byrd Ranch, Inc. v. Interwest Savings Association*, 717 S.W.2d 452, 454-55 (Tex. App. – Fort Worth 1986, no writ).  The *Byrd* court, however, contrasted its facts with examples from decisions where "an order has been held <u>sufficient</u> to comply with rule 683," including:

- "the conduct 'would alter the status quo and tend to make a final judgment in favor of appellees impossible or difficult to enforce;'"

- The "moving party 'would be harmed unless the temporary injunction were issued, as the status quo could not be maintained without the injunction;'"

- "or that the moving party 'will probably sustain irreparable injury and damage to its business' if the conduct continues."

28

Here, the district court states "Ameripro will suffer a probable, imminent, and irreparable injury," and then proceeds to list *those same reasons*. CR 224. In addition, the Temporary Injunction states multiple other reasons as well, as quoted above. CR 223-24.

The other decisions that Appellants cite are inapposite, because the temporary injunction orders in those decisions did not list any reasons for issuance, and in several instances did not mention "injury" at all.[23]

As stated in *Intercontinental Terminals Company, LLC v. Vopak North America, Inc.*, 354 S.W.3d 887, 899 (Tex. App. – Houston [1st Dist.] 2011, no pet.), which Appellants cite in their brief, "An explanation of the pending harm to

---

[23] *Moreno v. Baker Tools, Inc.*, 808 S.W.2d 208, 211 (Tex. App. – Houston [1st Dist.] 1991, no pet.) (order does not mention "injury" or otherwise state why an injunction was issued); *Fasken v. Darby*, 901 S.W.2d 591, 593 (Tex. App. – El Paso 1995, no pet.) (the order "makes no effort" to list any reason and does not even mention "injury"); *Monsanto Co. v. Davis*, 25 S.W.3d 773, 789 (Tex. App. – Waco 2000, writ dism'd w.o.j.) (order states there is "probable injury" but does not state that it is "irreparable" nor attempt to state any reasons); *Cornelison v. Offshore Entertain. Corp.*, 2002 WL 34231619 *2 (Tex. App. – Corpus Christi Dec. 5, 2002, no pet.) (states there will be "irreparable injury," but "wholly fails to identify" any); *International Brotherhood v. Becon Construct. Co., Inc.*, 104 S.W.3d 239, 244 (Tex. App. – Beaumont 2003, no pet.) (order does not attempt to state any reasons why there might be irreparable injury); *University Interschol. League v. Torres*, 616 S.W.2d 355, 356-58 (Tex. Civ. App. – San Antonio 1981, no pet.) (same); *General Homes, Inc. v. Wingate Civic Ass'n*, 616 S.W.2d 351, 353 (Tex. Civ. App. – Houston [14th Dist.] 1981, no pet.) (order states there will be irreparable injury, but no reasons recited); *Stoner v. Thompson*, 553 S.W.2d 150, 151 (Tex. Civ. App. – Houston [1st Dist.] 1977, writ ref'd n.r.e.) (order stated the situation was "harmful," but failed to state any reason); *Kotz v. Imperial Cap. Bank*, 319 S.W.3d 54, 56 (Tex. App. – San Antonio 2010, no pet.) ("Merely stating that 'irreparable injury will result,'" without more, insufficient); *State v. Cook United, Inc.*, 464 S.W.2d 105, 106-07 (Tex. 1971) (The Supreme Court *reinstated* the temporary

the temporary injunction applicant, along with a specific recitation of the conduct enjoined, is all that is necessary to achieve Rule 683's purpose." This Temporary Injunction does so in detail.[24]

## II. Appellants' own admissions establish that Ameripro's builder clients are "customers" under the non-solicitation clauses.

Appellants state in their brief that they disagree with the "district court's construction of the employment contract term 'customer' to include residential homebuilders," such as Brohn, Clark Wilson, and Seaholm. App. Br. 30. They argue that when the non-solicitation provisions in their contracts refer to "customers," they had intended to use the narrower phrase "borrowers" instead. Appellants' argument, however, is without merit for several reasons.

### A. Appellants make no attempt to address the testimony (including their own sworn admissions) that customers include borrowers *and* "builder customers."

First, Appellants' argument is contradicted by their own admissions. At the injunction hearing, Nasserfar admitted that part of his job at Ameripro was to build goodwill with Ameripro's "builder customers," and that he would submit expense

---

injunction, despite no reference to "injury," because the violated "statute itself declares the injury" and "the "order need not restate the words of the statute").

[24] Appellants' reasons for citing *Intercontinental* are particularly unclear: that court *affirmed* a temporary injunction despite the fact that the trial court (unlike the instant case) "struck-through" a paragraph relating to the applicant's "probable right of recovery." 354 S.W.3d at 898-99.

reports to Ameripro for entertaining them. 3RR 52-53.[25] Task admitted that Ameripro "customers," as used in the contracts, included referral sources, and that he was contractually barred from soliciting them unless they were his customers before he joined Ameripro. 2RR 185-86.[26]

Nasserfar further stated that Ameripro was the "exclusive lender" for Brohn and Clark Wilson. 3RR 50-52; AX 67. In fact, Nasserfar admitted that as Ameripro's branch manager, he developed a "builder centric model" for Ameripro. 3RR 48-50; AX 75. In social media, Task as well admitted that Ameripro "clients" included builders. AX 55.

In addition, Ameripro's President testified that Ameripro's customer base included "builders" with whom Ameripro had business relationships (including for lender credits on loan transactions), and who served as referral sources. 2RR 68-71, 142-43. Brohn Homes, Clark Wilson Builders, and Seaholm Residences (the only builders listed in the Temporary Injunction) in particular were "customers" of

---

[25] 3RR 52-53 (He asked Ameripro to reimburse him for lunches and dinners with "Centerra, Brohn, and other clients." "Q. Part of what AmeriPro paid you to do was to build goodwill with its builder customers, correct? A. It wasn't in my employment agreement. Q. But that's part of what you did as your job was to build goodwill with these customers, right? A. I believe so.").

[26] 2RR 185-86 ("Q. On Page 112, Line 22, 'If you developed a relationship with a referral source after you began at AmeriPro, do you believe you can solicit to them?' … Answer: 'If it was a new referral source, I wouldn't solicit them. They can solicit me. They can call me, but I can't solicit them.' Question: 'And you can't solicit them under the employment agreement as you understand them' – 'understood them, correct?' Answer: 'It's my understanding for 12

Ameripro when the Individual Appellants worked there, 2RR 50, 69-70, 100-02; 3RR 67-68, and therefore fell within the terms of the non-solicitation provisions.

Contrary to statements in Appellants' brief, Nasserfar and Task did <u>not</u> have a customer relationship with those three entities until after they were employed at Ameripro, so as to fit within any exception to the non-solicitation clauses. 2RR 100-02, 201; 3RR 67-68, 177-78. Neither did Oak Mortgage. 2RR 52.

### B. The evidence regarding builder customers is consistent with the non-solicitation clause.

Appellants also argue that a reference in the employment agreements to "customer and their loan" means that the court should substitute the narrower phrase "borrower" in place of the broader term "customer." The "customers" of Ameripro's lending business, however, encompassed services for *both* builders and borrowers, not one *or* the other. In addition to stating that Ameripro was the "exclusive lender" for builders Brohn and Clark Wilson, Nasserfar wrote that the "builder centric model" at Ameripro led to "timely closings, and assisting on making sales for our builder partners." AX 75; *see also* 2RR 50-51, 68-71, 142-43. Appellants' own admissions show that the reference to "loan" is consistent with the district court's belief that "customers" as used in the contracts was

---

months.' … Question: 'Who do you believe you can solicit business from?' Answer: 'Any client, customer, business referral, realtor source that I knew prior to AmeriPro Funding.'").

intended to include builder customers. Moreover, the one-year non-solicitation would be meaningless if restricted to homebuyers, given the unlikelihood that a typical buyer would purchase another home so quickly after their last purchase, in contrast to the continuous business relationship that Ameripro had with its builder customers.

In their brief, Appellants make no attempt to explain or otherwise address any of the above testimony and documentary evidence. They make no attempt to explain their prior admissions that "customers" under the contracts include builders, or the testimony that Ameripro's "customers" specifically included Brohn, Clark Wilson, and Seaholm. They simply ignore it.

Appellants' wholesale failure to mention any of the evidence which contradict their arguments should be fatal to their appeal. A reviewing court "cannot reverse a trial court's order if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision." *Universal Health Serv. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App. – Austin 2000, no pet.). "The evidence is viewed in the light most favorable to the trial court's order, indulging every reasonable inference in its favor," and the reviewing court may reverse only if the district court's order "was so arbitrary as to exceed the bounds of reasonable discretion." *Id*.

**C.** **Appellants' argument that the definition of "customers" should be construed against Ameripro conflicts with the plain language of the contracts, which disclaim that either party is sole drafter.**

Appellants also argue that the employment agreements do not define "customer," and therefore the phrase should be construed against Ameripro. The contracts themselves, however, negate Appellants' argument.

Nasserfar and Task agreed that "no party shall be deemed to be the drafter" and the provisions shall not be construed "against either party as the drafter." AX 11, 17. Gosnay likewise agreed that his contract "shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter." AX 18.

Appellants' argument also fails because it disregards the applicable standard of review, which indulges every reasonable inference in *favor* of the trial court's ruling, not against it. *Universal*, 24 S.W.3d at 576. Their latent ambiguity argument is unsound for the same reason: *Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 303 S.W.3d 700 (Tex. 2010) was a *summary judgment* appeal, and therefore applied an appellate standard *opposite* that of temporary-injunction review.

Nor would a drafter's rule aid Appellants. Appellants' brief states that customer is "generally defined" as one who regularly has "'business dealings" with a business or "'who customarily has dealings with a business establishment.'"

App. Br. 32. That plain English definition, however, supports the district court's finding, and is consistent with testimony from both sides which construes "customers" to include Ameripro's "builder customers."

## III. Injunctive relief was also independently warranted because Appellants were barred from soliciting Ameripro customers for a *competitor* in breach of fiduciary duties, separate and apart from their breaches of contract and misappropriation.

Appellants also argue that the identity of builders is not "secret" or confidential information. Appellants' overly simplistic argument, however, mischaracterizes the customer information they actually stole from Ameripro, which was far more extensive, and how they went about taking it.

Just as importantly, Appellants ignore the district court's findings that they violated multiple other tort and contract duties, which Appellants do not address in their brief. The district court's findings of "breach of fiduciary duty," breach of contract, tortious interference, conversion, and misappropriation, each separately and <u>independently</u> warranted injunctive relief. *ERI Consult. Engrs., Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) ("courts may fashion equitable remedies" when a fiduciary "competes with a principal" or usurps an opportunity); *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) (same); *Hunter Bldgs. & Mfg., LP v. MBI Global, LLC*, 436 S.W.3d 9, 15 (Tex. App. – Houston [14th Dist.] 2014, pet. denied) (claimant "has the same equitable remedies" against

35

a party who knowingly "participates" in another's breach of fiduciary duty).

## A. Appellants did not merely take the names of builder customers. They took pricing, lender credit data, compilations of builder preferences, and multiple other computer data.

Ameripro's confidential customer information is not simply builders' names and telephone numbers, but includes the lender credits for loans, and its compilation of builder closing preferences and other details which Ameripro has aggregated over time — all of which Appellants fail to mention anywhere in their brief.

The Temporary Injunction specifically lists Ameripro's "pricing information," "builder preferences," and "transaction details," among the data that Appellants misappropriated from its computer network and premises. CR 224. Appellants' brief makes no mention anywhere of those findings. Ameripro's lender credits for loans and customer compilations, for example, are not publicly available information, Ameripro made reasonable efforts to maintain secrecy of that information, and disclosure of that information would give an economic advantage to a competitor. 2RR 66-68, 70-71, 81-82, 89-91, 99, 143. That would appear to be why Appellants secretly downloaded it from Ameripro's computers in the first place.

For the same reasons, that evidence also satisfies the Texas Uniform Trade Secrets Act's ("TUTSA") elements of a "trade secret," which explicitly includes a

"compilation," "financial data," or "list of actual or potential customers" which have economic value and for which reasonable efforts were made to maintain secrecy. Tex. Civ. Prac. & Rem. Code § 134A.002(6).

**B. Appellants' solicitation of Ameripro customers and use of confidential information for that purpose, even while the Individual Appellants were still Ameripro's fiduciaries**.

Appellants also ignore the Temporary Injunction findings that they engaged in multiple other tort and contract violations, which independently support the Temporary Injunction.

Appellants' *sole* reference to "fiduciary" is to claim that Oak Mortgage did not owe a duty itself. App. Br. 57. However, the evidence shows that Oak Mortgage was a knowing participant in the Individual Appellants' breaches of fiduciary duty, and also conspired with them, which makes it "jointly liable" for that conduct. *Hunter*, 436 S.W.3d at 15; *Sharma v. Vinmar Int'l, Ltd*., 231 S.W.3d 405, 429 (Tex. App. – Houston [14th Dist.] 2007, no pet.) (injunctive relief by necessity must be full and complete so that those who have "'breached their fiduciary relationship, as well as those who willfully and knowingly have aided them in doing so, will be effectively denied the benefits and profit flowing from the wrongdoing'") (emphasis added).

Appellants' failure to address breach of fiduciary duty is particularly amazing, given that it was a focal point of evidence and argument below. 2RR

37

182-83, 192-94; 3RR 38-39, 187-88, 193. On December 10, 2014, well before the Individual Appellants resigned from their fiduciary roles, Oak Mortgage wrote them that they could "solicit to your book of business," solicit their "past customer database," and solicit from the "builder/realtor relationships." 2RR 191-92; AX 56. The next day, December 11, 2014, Oak Mortgage agreed to indemnify them in future litigation with Ameripro. AX 53; AX 81.[27] Even after securing a *competitor's* agreement to indemnify them *against* their principal, they continued serving as fiduciaries for Ameripro for another month. 2RR 182-83, 194.

While he was still Ameripro's fiduciary, Nasserfar reported to Oak Mortgage that he was "dropping in on all builder contacts," having driven almost 200 miles to do so. AX 63 (emphasis added). Nasserfar admitted he reported that solicitation progress to "the competitor of the company you were working for," and that he still owed a duty of loyalty to Ameripro at the time. 3RR 58.

On January 8, 2015 – again while Nasserfar was still a fiduciary to Ameripro – Oak Mortgage also sent him "scripts" to use for "All previous clients & database," "Borrowers in Pipeline," "Realtors in Pipeline," and "All other Realtors." AX 78; 3RR 59. Nasserfar also contacted principals and employees of Ameripro's existing customers about his plan to open a competing office with Oak

---

[27] AX 53 and AX 81 are Oak Mortgage's Offer Package to Nasserfar and Task, and

38

Mortgage (even as he was paid to build goodwill for his principal, Ameripro). 3RR 53, 56-57; CX 1 at 15-16.

The confidential information Appellants stole was also intertwined with their solicitation of Ameripro customers in violation of fiduciary duties and the non-solicitation clauses. They downloaded Ameripro's computer compilations for three Ameripro builder customers, including Brohn Homes and Clark Wilson Builders, their fees and tax rates (broken down by community), working capital, and closing preferences, requirements, lender credits for loans, and other non-public customer information. AX 35; 2RR 93-94. They met with business prospects for the benefit of Oak Mortgage – while they were still fiduciaries of Ameripro – and scheduled future meetings to occur on dates when they would be working at Oak Mortgage. 2RR 203-05; AX 60-62.

Oak Mortgage also e-mailed them instructions on how to evade detection of their violations. AX 57. Task could not think of an explanation for the instructions, except to make it appear they were not soliciting. 2RR 196-97.[28]

None of this evidence is even mentioned anywhere in Appellants' brief. They simply ignore it. The evidence does not support their argument that they

_____

memorializes the December 11, 2014 agreement.

merely took and used only publicly-available *names* of builders.

Appellants also completely ignore the multiple other categories of confidential information listed in the Temporary Injunction, which would equally assist them in unfairly competing. Their brief makes no reference to "general ledgers," "profitability," "pro forma," and other categories of data they not only stole, but that Oak Mortgage uploaded and analyzed. AX 28-36, 49. Appellants' counsel told the district court that Appellants had returned "over 20,000 electronic files" to Ameripro on April 27, 2015 alone — meaning that those competitors not only took Ameripro's information, but had held it for several months after they opened their competing office. 2RR 22.

In sum, Appellants' argument that someone can do a Google search to find a builder's name does not begin to scratch the surface of the confidential information they downloaded and gave to a competitor, nor does it address the several categories of tort and contract duties the district court found they violated.

C. **Even if Appellants supposedly *could* have publicly obtained some of the data they took from Ameripro computers, they tortiously downloaded Ameripro's work product**.

Appellants' argument that they *could* have conducted public searches to

---

[28] 2RR 196-97 (Task impeached: "Q. Question: 'Is there any business reason that you can think of about waiting one month before you go after the other person, other than to make it appear that it's not a solicitation?' Answer: 'You'd have to ask him. No.'").

compile the customer information stored on Ameripro's computers, aside from being false, does not defeat the trade secret status of Ameripro's data. Nor would that possibility give them license to thieve copies from Ameripro's computers.

In *Reliant Hospital Partners, LLC v. Cornerstone Healthcare Group Holdings, Inc.*, 374 S.W.3d 488, 500-01 (Tex. App. – Dallas 2012, pet. denied), the appellants argued that a "compilation" of target market opportunities was not secret because "such information was readily available through the internet or by exerting minimal effort to talk with others." 374 S.W.3d at 500-01. Unlike the instant case, the appellants in *Reliant* were not restricted by a non-solicitation clause. But the *Reliant* court rejected their argument, noting "the question is not 'How *could* he have secured the knowledge?' but 'How *did* he?'" *Id*. The court held that the compilation of market targets constituted a "trade secret" which one of the appellants obtained while still employed by his prior employer. *Id*.

Similarly, in *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App. – Houston), *appeal stayed*, 771 S.W.2d 562 (Tex. App. – Houston 1989), the court rejected the appellant's argument that "customer lists" were not trade secret because the information was "readily accessible from other sources." The court stated that "'the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis,'" and

noted that while some of the information at issue was publicly available, evidence showed that "not all" of it was.  764 S.W.2d at 277.

The Individual Appellants' conduct not only breached the employment contracts, but also their common law duties.  Oak Mortgage actively participated in both.  In *Hill*, this Court quoted with approval, "'But it is well established that even without an enforceable contractual restriction, a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information <u>or</u> trade secrets acquired by or imparted to him in the course of his employment.'"  2011 WL 56061 at \*2;  *Renewdata Corp. v. Strickler*, 2006 WL 504998 \*12 (Tex. App. – Austin 2006, no pet.) (same).  The fact that the Individual Appellants were *fiduciaries* when they committed their acts, and had signed contracts under which Ameripro is sole owner of the records they took, makes their conduct particularly inexcusable.

## IV.  Appellants' argument that they had returned all confidential information of Ameripro prior to the hearing is also false.

Appellants also argue "all confidential information of Ameripro – both paper and electronic – was returned to Ameripro prior to the temporary injunction hearing," and there is no harm caused by their "previous possession of confidential information of Ameripro."  App. Br. 27, 39-40, 47.  Those admissions confirm that Appellants took "confidential information of Ameripro" in the first place.

Their claim that they "returned" all of it before the hearing, however, is false in several respects, in terms of Ameripro documents they kept and did not return, the system metadata they stripped out of the Ameripro documents, and the documents Appellants destroyed even after a TRO commanded their return.

**A.** **Appellants did not return all confidential information, they violated the TRO, and they specifically stripped out system metadata from the documents they did provide**.

Appellants did not return all of the confidential information they downloaded from Ameripro's computers and removed from its premises, as they tried to argue in the district court.

When the TRO issued, Appellants were commanded to return Ameripro's confidential documents "in whatever medium such documents and information exists." CR 97. Appellants disobeyed that command, however, by keeping <u>all</u> of the media on which those documents had been downloaded, and instead sending Ameripro only copies, of selectively picked portions, with all of the system metadata stripped out. 2RR 227 (expert discusses "'selective production'" and "file system metadata or any other artifacts" which is missing even for the documents that were provided).

At the temporary injunction hearing, Appellants' counsel admitted that Appellants had not returned the media, and argued that Ameripro could "come to my office, we'll arrange to make that available for their [Ameripro's] forensics to

look at it." 2RR 28. To avoid a repeat of the TRO violation, the district court included detailed instructions about the forensic images that Appellants were required to return to Ameripro. CR 224-25.

When the district court announced her ruling from the bench at the temporary injunction hearing, Appellants' counsel confirmed that the court ruled that his forensic expert "is *going to* provide" the forensic images, and added, "All those files *will be* returned, if they haven't already been returned." 3RR 206.

In short, the court was not required to accept Appellants' inconsistent statements that they had already returned all of the information, in the face of evidence which clearly showed they had not. That is particularly so, given their pattern of misconduct: they previously tried to evade detection of their solicitation activities, while they were still fiduciaries, violated federal regulations, and hid from Ameripro that they had taken its confidential records. AX 57; 2RR 155-56, 160-61, 167-72, 174, 184, 196-97.

### B. Appellants destroyed documents even after a TRO commanded their return.

In addition, Appellants destroyed customer files that the court previously commanded them to return to Ameripro. That was a continuation of the practice Appellants had engaged in before, where they attempted to "permanently destroy Ameripro documents and files." CR 223. Instead of returning all Ameripro

44

documents prior to the temporary injunction hearing, Appellants busily engaged in committing additional violations.

The TRO commanded Appellants to "return to Ameripro all confidential documents and information they removed from Ameripro, in whatever medium such documents and information exists." CR 97. Two days after the TRO issued, Appellants deleted 140 folders from a USB device they had labeled "Nasserfar External Drive." 2RR 233-36; AX 46. The pathnames for the deleted folders show that they were part of what the TRO commanded to be returned to Ameripro, including: "AMB Profit & Loss Jan-Aug" files, "APF Accounting System Loan Details '14," "Monthly Pipeline Details," and "Loan_files" and "Loan Details" for several months. AX 46. In *Lynd v. Bass Pro Outdoor World, Inc.*, 2014 WL 1010120 *8 (Tex. App. – Dallas 2014, pet. denied), the court held that "the trial court did not err by implicitly finding that the harm was imminent and not speculative," noting that the conduct had continued up "until the entry of the temporary restraining order" and appellant was forced to stop. Here, even a TRO did not dissuade Appellants from continuing their misconduct.

### C. The fact that a competitor misappropriated confidential information at all also supports issuing the injunction.

Leaving aside Appellants' failure to return Ameripro's confidential information, the fact that they took Ameripro's protected property in the first place

warranted injunctive relief.  *Lasser v. Amistco Separation Prods., Inc.*, 2014 WL 4952501 *8-9 (Tex. App. – Houston [1ˢᵗ Dist.] Oct. 2, 2014, no pet.) (inclusion of a requirement the appellant "has already performed" was appropriate under Rule 683, helps "prevent the repetition of the offending conduct," and prevents the need to revise the order "should it be discovered … that [appellant] has any additional confidential information").

Appellants also argue that they should not be enjoined because they "do not need" Ameripro's confidential information given their "extensive industry knowledge."  App. Br. 40.  Again, that begs the question why Appellants misappropriated over 20,000 confidential documents from Ameripro in the first place, and why its competitor, Oak Mortgage, specifically requested those records. For example, when Nasserfar was still acting as Ameripro's fiduciary, Oak Mortgage wrote him that it needed "some more information from you," including Ameripro's "Product Mix," profit and loss statements, "Pricing" so Oak Mortgage could "compare it to our pricing," and other employees' compensation.  AX 27; 3RR 44-46.  The district court was not required to accept Appellants' representation, particularly given the evidence of its falsity.

**D.** **Appellants *used* Ameripro's confidential information, but *taking* such data was also wrongful misappropriation**.

Appellants' argument that "Ameripro offered no evidence of any past

46

improper *use* of any alleged confidential information by Appellants" is also false. App. Br. 41. For example, after Nasserfar gave Oak Mortgage a copy of Ameripro's profitability report, Oak Mortgage uploaded and analyzed it for several hours. They engaged in that misappropriation even before Nasserfar had resigned his fiduciary role. AX 49-50; 2RR 230-32. Appellants even forgot to remove Ameripro's address before they began using its proprietary forms. 2RR 96-98; AX 36-37. The district court acted within its discretion in rejecting Appellants' argument as not credible.

Appellants' argument is also legally incorrect. Misappropriation is not limited only to "use," but also occurs when there has been an "acquisition" or "disclosure or use" of confidential information through improper means, each of which is prohibited conduct. Tex. Civ. Prac. & Rem. § 134A.002(3). Appellants have not even challenged the evidence that they wrongfully acquired Ameripro's confidential information.

## V. The district court correctly found that Ameripro does not have an adequate legal remedy.

The district court also properly found based on the evidence that "a future award of damages would not fully or adequately compensate Ameripro," that the "full extent of injury to Ameripro" would be "very difficult to ascertain or quantify," and that "Ameripro does not have a legal remedy that would be

47

adequate in lieu of injunctive relief." CR 224.

Those findings are supported by the record. Ameripro's competitors misappropriated over 20,000 of its confidential records, ranging from its customer data to its pro formas, and used their fiduciary positions to solicit customers for a competitor in violation of common law duties and the contracts. 2RR 22, 85-85, 91-94, 96-99, 156-61, 164-72, 174, 177-78, 183-84, 203-05; 3RR 42, 53, 55-61, 127-28; CX1 at 15-16; AX 28-38, 58, 59-63, 78, 80. Ameripro's President testified that Ameripro could not trace and calculate the resulting damages, that the injury were "ongoing," and that Appellants used Ameripro's confidential information "specifically to open up a new location in direct competition with us." 2RR 101-03. And again, Ameripro presented evidence of multiple cat-and-mouse examples where Ameripro caught Appellants giving instructions on how to evade detection, destroying evidence, placing information on a local drive where Ameripro would not find it, and secretly soliciting and taking Ameripro's confidential data. AX 27, 43, 46, 49-50, 57; 2RR 155-56, 160-61, 167-72, 174, 182-83, 196-97, 217-21, 230-36.

By their nature, those are injuries the full extent of which would be difficult to ascertain or quantify (or fully uncover), and for which a future award would not be complete or adequate. In *Hill*, for example, this Court noted that the appellant "possessed confidential information belonging to" the appellee, and that "harm to

the trade secret owner may be presumed." 2011 WL 56061 at *5. *Hill* noted that "*if*" the appellants "were to impermissibly use McLane's trade secrets" or disclose them, "the resulting damages would be difficult to calculate," and that the "very purpose of the injunction" is to prevent such violations from occurring. 2011 WL 56061 at *5. *See also Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App. – Amarillo 1995, no pet.) (employees took confidential information and "began to resolicit the businesses," agreeing that a "legal remedy is inadequate" and damage "cannot be easily calculated").

**A. The district court found Ameripro has a likelihood of success on multiple tort theories for which injunction is the only effective relief, not just breach of contract**.

Moreover, this case is not limited to a simple breach of contract action: Appellants' theft of thousands of confidential records, and using Ameripro's existing fiduciaries to solicit customers and business for a competitor, sound under multiple tort theories. As this Court noted in *Garth v. Staktek Corp.*, 876 S.W.2d 545 (Tex. App. – Austin 1994, writ dism'd w.o.j.), "injunctions against trade secret violations may be necessary to provide meaningful legal protection to the owners of intellectual property," and monetary damages may not sufficiently protect "from unfair competition by those who improperly appropriate confidential information." 876 S.W.2d at 550. *See also Flake v. EGL Eagle Global Logistics, L.P.*, 2002 WL 31008136 *4 (Tex. App. – Houston [14th Dist.] Sept. 5, 2002, no

49

pet.) ("A legal remedy is inadequate if damages are difficult to calculate or their award may come too late. … Although any damages Eagle stands to suffer or has suffered are compensable through money damages, '[i]njunctive relief is property to prevent a party, that has appropriated another's trade secrets, from gaining unfair market advantage,'" and finding a temporary injunction "the only effective relief available"); *Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W.3d 215, 228-29 (Tex. App. – Fort Worth 2009, pet. denied), *cert. denied*, 559 U.S. 1036 (2010) (a "remedy is not adequate simply because some of the proven damages are calculable," and a dollar value "may not easily be assigned" to business disruption, "loss of clientele," "office stability," "marketing techniques," and other intangible injuries).[29]

## B. Even in pure contract cases, findings of inadequate remedy will be upheld where, as here, some evidence supports it.

Even in cases where the claims are limited to breach of contract (unlike the instant case, where district court found likelihood of success on multiple theories), courts defer to the trial court's determination that damages will not fully

---

[29] *See also Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 639 (Tex. Civ. App. – Houston [14th Dist.] 1980, writ ref'd n.r.e.) ("mere reimbursement of profits would not afford complete, final and equal relief because appellees would still be able to compete in the area in violation of the express agreement not to compete," finding denial of temporary injunction an abuse of discretion); *Salas v. Chris Christensen Sys., Inc.*, 2011 WL 4089999 *8 (Tex. App. – Waco Sept. 14, 2011, no pet.) (potential damages caused by "actions of appropriating and

compensate the claimant or would be difficult to measure.

For example, this Court in *Universal* noted that the only wrongful conduct alleged in that case was "breach of contract," but nevertheless upheld the trial court's conclusion that damages would be difficult to calculate and damages might not afford complete relief. 24 S.W.3d at 577-78 & n. 5. Similarly, in *Walling v. Metcalfe*, 863 S.W.2d 56 (Tex. 1993), the Texas Supreme Court reinstated a temporary injunction – despite the fact that the applicant's only cause of action was for breach of contract and did not ask for permanent injunctive relief. The Court rejected the court of appeals' conclusion that a "cause of action for money damages alone" was not sufficient to support an injunction, adding, "Simply because the applicant for a temporary injunction asks only for damages as ultimate relief does not guarantee that damages are completely adequate as a remedy." 863 S.W.2d at 57-58.

C. **Injunctive relief is consistent with Ameripro's claim for damages for Appellants'** *past* **conduct**.

Ameripro's request for damages based on Appellants' past violations is consistent with the district court's findings of imminent irreparable harm and inadequate legal remedies if Appellants were not enjoined.

---

implementing" confidential information for the "benefit of…competitors in the future arguably are not complete and cannot be easily calculated; therefore, a legal remedy is inadequate").

In *Topheavy,* the appellant argued that "any potential harm … has already occurred," because 80,000 games with appellee's likeness were already in circulation. 2005 WL 1940159 *6. This Court noted that the appellee was "also seeking damages," but explained that "the mere fact that Doe has already been injured does not necessarily mean that further distribution of the game would not exacerbate the preexisting injury or create new injuries altogether," nor would the injury be any more ascertainable with a sufficient degree of certainty. An injunction to prevent "additional irreparable injury" was not an abuse of discretion. *Id*. So it is the case here.

The decisions Appellants cite are inapposite. In *Butnaru v. Ford Motor Co*., 84 S.W.3d 198 (Tex. 2002), the Texas Supreme Court *reinstated* a temporary injunction that had been dissolved on appeal, finding that although it was a contract action, the applicant desired a specific piece of property, and the district court did not abuse its discretion in finding no adequate legal remedy. 84 S.W.3d at 211. In *Reach Group, LLC v. Angelina Group*, 173 S.W.3d 834 (Tex. App. – Houston [14th Dist.] 2005, no pet.), *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230 (Tex. App. – Houston [1st Dist.] 2003, no pet.), and *W.R. Grace & Co. v. Henson*, 2007 WL 2389547 (Tex. App. – Corpus Christi Aug. 23, 2007, no pet.), the courts addressed whether the trial courts abused their discretion when they *denied* a temporary injunction. Unlike the instant case, the applicant in

52

*Grace* admitted it "knew of no misuse of information" and there was "no evidence of wrongful acts." 2007 WL 2389547 *3. The applicant in *Reach* acknowledged that damages "were capable of precise measurement," and that its potential damages were "also capable of being calculated," and given those admissions the court did not abuse its discretion. 173 S.W.3d at 838. The court in *Cardinal* observed that it must view evidence in the light "most favorable" to the court's decision, not against it;  the applicant admitted it "did not know whether [it] had suffered any economic damages," and that its sales had "doubled." 106 S.W.3d at 235-36. None of those decisions support that this Court should substitute its factual findings for the trial court's based on *this* record.

### D.     Appellants' argument, in addition to being baseless, is outside the hearing record and should be disregarded.

Finally, Appellants improperly purport to rely on pleadings and discovery served *after* the Temporary Injunction, which were not part of the hearing record. App. Br. 46, 54. Ameripro's request for damages is consistent with the Temporary Injunction. Nevertheless, Appellants' arguments outside the record should not be considered. *Branch Banking & Trust Co. v. TCI Luna Ventures, LLC*, 2013 WL 1456651 *4 n. 4 (Tex. App. – Dallas Apr. 9, 2013, no pet.) (sale "occurred after" the temporary injunction and "Accordingly we do not consider TCI Luna's arguments that are outside the temporary injunction hearing record.").

53

**VI.** **The Temporary Injunction is not overly broad, and instead is narrowly tailored to protect against imminent irreparable harm**.

Appellants' argument that the Temporary Injunction is overly broad is without merit. It is narrowly tailored to protect against imminent irreparable harm.

Appellants argue that the injunction covers media in their possession, but the district court tailored the Temporary Injunction to "media that *contains or did contain Ameripro files or information*" — in other words, the information which the Temporary Injunction found Appellants had attempted to "permanently destroy" and had "taken from Ameripro's computer network and premises." CR 223-24. In addition to common law protection of Ameripro's confidential information, the Individual Appellants contractually agreed that Ameripro is the sole owner of those records, and that they would not retain any copies of that information. AX 11, 17-18. They not only retained copies of Ameripro's records, however, but gave them to a competitor. (That evidence is cited and quoted in detail at pp. 7-13 of the Statement of Facts.)

The district court's ruling that the original media should be held by Appellants' counsel is also reasonable and supported by the evidence. Appellants engaged in deliberate efforts to conceal which items stored on those media consisted of Ameripro records. For example, one of Nasserfar's electronic files was labeled "Nasserfar personal e-mail," but consisted instead of Ameripro

borrowers' credit reports and loan applications. 3RR 174-75. As cited above, Appellants also tried to conceal their thefts of information, and their solicitation efforts. Leaving aside Appellants' *prior* efforts to destroy Ameripro files, they destroyed Ameripro files stored on the electronic media *even after the district court issued a TRO compelling those files to be returned*. Appellants also initially denied that they possessed *any* Ameripro confidential records, 2RR 163, despite their subsequent return of over 20,000 such files after suit was filed, and despite evidence that Oak Mortgage used that media to analyze the stolen data. Finally, Appellants made the choice to store the confidential information they stole from Ameripro *on that media*. The district court was well within its discretion in requiring Appellants' counsel to keep possession of the media as Attorneys' Eyes Only.

The district court also narrowly tailored the injunction to three customers whom Appellants solicited in breach of contract and fiduciary duties. (The district court chose to exclude a fourth customer from the injunction. 3RR 209.) *Correa v. Houston Surg. Asst. Serv., Inc.*, 2013 WL 3958499 *12 (Tex. App. – Houston [14th Dist.] July 30, 2013, no pet.) (injunction was "specifically tailored to prevent appellants from usurping the competitive advantage derived from HSAS, Inc.'s confidential information," as it was "appropriately limited to specific hospitals" with whom "the appellants actually worked.").

Appellants argue that Oak Mortgage should not be restrained because there "is no contract or fiduciary relationship" between it and Ameripro. However, as discussed on pp. 35-37 above, Oak Mortgage's knowing participation in breaches of fiduciary duty and tortious interference makes it jointly liable.

Oak Mortgage's argument that its "officers and employees" should not be enjoined is also meritless. Rule 683 expressly states injunctions are binding on parties *and* "their officers, agents, servants, employees." *Miller*, 901 S.W.2d at 600 n. 2 (the "court was also permitted to extend the injunction to the employer's other employees," and the appellants argument that "only two acted inappropriately lack merit"). Moreover, it is Oak Mortgage's officers who encouraged Nasserfar, Task, and Gosnay to breach their fiduciary duties and contracts, who analyzed the stolen data, and who suggested how to evade detection. AX 27, 49, 56-57, 78. The injunction against Oak Mortgage would be ineffectual if the agents through whom it acts were free to violate the terms.

Finally, the district court acted within its discretion in preserving the status quo through trial, instead of providing for the injunction to end on January 16, 2015. The purpose of an injunction is to preserve the status quo pending a trial. The "status quo" is the "the last, actual, peaceable, noncontested status which *preceded* the pending controversy," *before* the activities "in violation of its agreements" began. *Frequent Flyer*, 281 S.W.3d at 222-23. Appellants are not

entitled to a credit on the non-solicitation period for the several months when they were actively violating it; those violations began before the fiduciaries left Ameripro, and continued at least four months afterward. As the court in *Sharma* stated:

> "It is well settled that injunctive relief 'must, of necessity, be full and complete so that those who have acted wrongfully and have breached their fiduciary relationship, as well as those who willfully and knowingly have aided them in doing so, will be effectively denied the benefits and profits flowing from the wrongdoing. … Far from being an overbroad order that forbids lawful competition, the trial court's order is narrowly tailored to preserve the status quo by protecting the secrecy of Vinmar's trade secrets and remedying the violence to the confidential relationship through which the Rew appellants acquired those trade secrets."

231 S.W.3d at 429.

When the district court entered a temporary injunction to maintain the status quo, it specifically rejected imposing a January 15 cut-off, noting that Ameripro can "argue that since they have been not complying" with the provision, "it shouldn't run." 3RR 213-14. Preserving the status quo as it existed before the violations began was within the district court's equitable discretion. *Rimkus Consult. Group, Inc. v. Budinger*, 2001 WL 619067 *4 (Tex. App. – Houston [14th Dist.] June 7, 2001, no pet.) (rejecting argument that "because the original time for expiration of the covenant not to compete has expired, this court should decline to enforce it," noting it would "be inequitable to allow" the pendency of litigation "to

deprive [Rimkus] of the benefit of injunctive relief"); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5ᵗʰ Cir. 2003) ("the district court has the power under Texas law to craft an injunction that extends beyond the expiration of the non-solicitation covenant," and agreeing that courts in equity "may impose injunctions that last beyond a contract provision's expiration date").

Second, the injunction is not based solely on the non-solicitation clause, but also on the Individual Appellants' conduct in soliciting the customers for Oak Mortgage while they were still fiduciaries, as well as violations of non-use and confidentiality provisions in taking customer information which do not expire on January 15. *Matrix Network, Inc. v. Ginn*, 211 S.W.3d 944, 946-47 (Tex. App. – Dallas 2007, no pet.) (leaving aside non-solicitation provision, parties used confidential information to compete unfairly in violation of the non-use and non-disclosure provisions, and "In such circumstances, we cannot conclude the expiration of the non-compete clause … renders this matter moot"); *Garth*, 876 S.W.2d at 548 (by appropriating confidential information, appellant was able to use it to gain a market advantage, and therefore "injunctive relief beyond the date" the technology became public was "an appropriate remedy"); *Salas*, 2011 WL 4089999 at *8 ("Injunctive relief is also proper to prevent a party, which has appropriated another's trade secrets, from gaining an unfair market advantage.").

**PRAYER**

For the foregoing reasons, Ameripro Funding, Inc. respectfully prays that this Court affirm the district court's Temporary Injunction Order, and that Ameripro have such other and further relief to which it may be justly entitled.

Respectfully submitted,

*/s/ Susan P. Burton*
Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com
GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5600
Facsimile: (512) 480-5862

ATTORNEYS FOR APPELLEE AMERIPRO FUNDING, INC.

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitations of Rule 9.4(i)(2)(B), Tex. R. App. P., because it contains no more than 14,228 words, excluding the parts of the brief exempted by Rule 9.4(i)(1), Tex. R. Civ. P.

This brief complies with the typeface requirements of Rule 9.4(e), Tex. R. Civ. P., because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font in text, and twelve-point Times New Roman font in footnotes.

*/s/ Susan P. Burton*
Susan P. Burton

**CERTIFICATE OF SERVICE**

I certify that on October 7, 2015, a true and correct copy of this Brief of Appellee Ameripro Funding Inc., was served *via* electronic service on the party as shown below:

Wm. Charles Bundren, Esq.
WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034

*/s/ Susan P. Burton*
Susan P. Burton